AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Adam Joiner | ) | Case No. |
| | ) | |
| | ) | |
| | ) | 19 MJ 04866 |
| | ) | |
| *Defendant(s)* | | |

FILED
CLERK U.S. DISTRICT COURT

NOV 1 2 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ October 10, 2019, _____ in the county of _____ Los Angeles _____ in the
_____ Central _____ District of _____ California _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(a)(1)(B)(i) | Concealment Money Laundering |

This criminal complaint is based on these facts:

Please see Attachment to Complaint and attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Nathan Cherney, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11-12-19

_____
*Judge's signature*

City and state:  _____ Los Angeles, California _____

The Honorable Frederick F. Mumm
*Printed name and title*

Arrest Warrant/Detention

**Attachment to Complaint**

(18 U.S.C. §§ 1956(a)(1)(B)(i), 3147)

On or about October 10, 2019, in Los Angeles County, in the Central District of California, defendant ADAM JOINER ("JOINER") conducted a financial transaction, that is, the recording of a grant deed transferring ownership of the real property located at 441 3rd Street, Manhattan Beach, California 90266, knowing that the property involved represented the proceeds of some form of unlawful activity, and which transaction, in fact, involved the proceeds of specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, which was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of such proceeds.

Defendant JOINER committed this offense while released under Title 18, United States Code, Chapter 207, in *United States v. Joiner*, No. CR 19-541-AB.

## **AFFIDAVIT**

I, Nathan Cherney, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since January 2018. I am currently assigned to a Complex Financial Crime squad of the FBI's Los Angeles Field Office, which is responsible for investigating corporate and securities fraud, including mail fraud, wire fraud, securities fraud, and insider trading.

2.      Since becoming an FBI Special Agent in 2018, I have received approximately 19 weeks of formal training at the FBI Training Academy in Quantico, Virginia, in financial analysis, interviewing, surveillance, and other investigative techniques. In June 2019, I also attended a multi-day Securities Industry Essentials formal training sponsored by the FBI Economics Crimes Unit. At this training, I received formal training essential to securities industry markets, regulatory agencies and their functions, and prohibited practices. Before joining the FBI, I performed numerous financial audits while employed as an auditor at a public accounting firm for approximately three years. I participated in many aspects of the audits including, but not limited to, procedures for fraud detection, financial analysis, and reviews of accounting and bank records. I received approximately eight weeks of formal training from the accounting firm including, but not limited to, fraud, accounting principles, financial analysis, and auditing principles. I hold a Bachelor of Arts degree in Economics from the University of Michigan and a Master of Science in Accounting from Michigan State University. I am currently a Certified Public Accountant in the state of California.

3.      In addition to my formal training and personal experience, I have learned from and worked alongside numerous senior FBI agents with years of experience in various criminal investigations including, but not limited to corporate and securities fraud, mail fraud, wire fraud, securities fraud, and insider trading. Throughout my experiences with these senior agents, I have received guidance, training, and hands on experience in various investigative techniques

including but not limited to, interviewing, surveillance, financial analysis, and other investigative techniques, including with respect to the identification and tracing of illicit proceeds.

## II.   **PURPOSE OF AFFIDAVIT**

4.      This affidavit is made in support of a criminal complaint and arrest warrant for ADAM JOINER for concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), while on release under Title 18, United States Code, Chapter 207, in violation of 18 U.S.C. § 3147(a).

5.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III.   **STATEMENT OF PROBABLE CAUSE**

6.      On October 18, 2019, ADAM JOINER pleaded guilty to orchestrating a fraud scheme in which he made false representations—and employed forged documents—to convince foreign investment firms to invest millions in a film project dubbed *Legends*. JOINER repeatedly claimed to have entered distribution agreements with major film distributors, such as Netflix, Inc., and Storyteller Distribution Co., LLC, doing business as Amblin Partners ("Amblin"), and even presented to the investors documents he claimed were executed agreements. In reality, he had entered into no such distribution agreements and had done little to no work in producing a film using the investment funds he was provided. Instead, he spent much of the proceeds on himself, including buying a house located at 441 3rd Street, Manhattan Beach, California 90266-6412 (the "Manhattan Beach House")—his personal residence—for over $5 million.

7.      A copy of the underlying complaint in that matter is attached as Exhibit 1.

8.      A copy of the plea agreement JOINER entered is attached as Exhibit 2.

9.      JOINER is currently released on bond in *United States v. Joiner*, No. CR 19-541-AB. According to the electronic docket in the case, sentencing is scheduled for March 6, 2020.

10.      As explained in more detail below, I submit that, while released on bond in the underlying prosecution, JOINER generated fraudulent releases on liens his victims recorded on the Manhattan Beach House so that he could sell it for almost $6 million. In doing so, he forged the signatures of real attorneys. I therefore submit that there is probable cause that he is engaging in concealment money laundering while on release pending sentencing.

**A.      JOINER's New Criminal Activity Committed While Released on Bond**

11.      From my review of title records, I know that both victim investment funds had previously recorded liens on the Manhattan Beach House. On November 7, 2019, I received records relating to that property.

a.      Among them was a notarized "release of writ of attachment," purportedly signed by Victim 1, an attorney for Mayer Brown on September 24, 2019. Mayer Brown actually represents KIP—one of the investment fraud victims—with respect to the filing of the lien. I received an email from Victim 1 in which she stated that the signature on the document is not hers.

b.      Also among the documents were a "release of notice of pendency of action (lis pendens)" and a "release of writ of execution" both notarized and purportedly signed by Victim 2 on September 27, 2019, in his capacity as an attorney at Sheppard Mullin. Sheppard Mullin actually represents Star Century—one of the investment fraud victims—with respect to the filing of the lien. I received an email from Victim 2 in which he stated that he did not sign either of the documents. He is currently an attorney, not with Sheppard Mullin, but with Buchalter, according to his signature block, email domain, and law firm website.

12.      I have also reviewed a grant deed, signed by JOINER (and, purportedly, his wife) with an apparent recording date of October 10, 2019. In it, JOINER and his wife conveyed the Manhattan Beach House to "Gregory B. Galusha and Devon A. Galusha."

      a.      An attorney for Sheppard Mullin also forwarded an email he received from "Greg Galusha," dated September 23, 2019, in which Galusha inquired, "Is it accurate your clients improperly filed liens after agreeing to a satisfaction of judgment last year? Joiner claims your client(s) are removing liens shortly. Not sure whether to trust him...."

13.      I have also reviewed a TitlePro247 property details report for the Manhattan Beach House. It lists a sale to Gregory B. Galusha and Devon A. Galusha for $5,988,000 on October 3, 2019, with a recording date of October 10, 2019.

14.      The foregoing facts indicate to me that JOINER is continuing to engage in criminal conduct even while released on bond in his underlying criminal case. Indeed, even the modus operandi of the new conduct matches that to which he already pleaded guilty: the use of fraudulent legal documents bearing forged signatures from real persons.

15.      Specifically, by selling the Manhattan Beach House under false pretenses and fraudulently releasing liens placed on it by the victim investment firms based in South Korea and China, JOINER has conducted "a transaction which in any way or degree affects interstate or foreign commerce . . . involving the transfer of title to any real property." 18 U.S.C. § 1956(c)(4). I further submit that JOINER's actions to fraudulently release the liens on the Manhattan Beach House were done with the intent to conceal "the nature, the location, the source, the ownership, or the control of the proceeds of his specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). Furthermore, because JOINER is currently released on bond pending sentencing pursuant to 18 U.S.C. § 3143, a section that appears in Chapter 207 of Title 18 of the United States Code, he has also violated 18 U.S.C. § 3147.

## IV. **CONCLUSION**

16.      For all the reasons described above, there is probable cause to believe that ADAM JOINER has committed concealment money laundering, in violation of 18 U.S.C.

//

//

§ 1956(a)(1)(B)(i), while on release under Title 18, United States Code, Chapter 207, in violation of 18 U.S.C. § 3147(a).

NATHAN CHERNEY, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this /2th day of November, 2019.

UNITED STATES MAGISTRATE JUDGE

**<u>Exhibit 1</u>**

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

## for the

### Central District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Adam Joiner | ) Case No. |
| | ) ~~19 MJ03283~~ |
| | ) |
| | ) 19 MJ03346 |
| _Defendant(s)_ | ) |

FILED
CLERK, U.S. DISTRICT COURT
AUG 1 3 2019
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   April 7, 2016, and August 12, 2016,   in the county of        Los Angeles        in the

    Central    District of      California    , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1957, and 1028A | Wire Fraud; Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; Aggravated Identity Theft |

This criminal complaint is based on these facts:

Please see Attachment to Complaint and attached affidavit.

☑ Continued on the attached sheet.

                                                        /s/
                                            _Complainant's signature_

                                            Nathan Cherney, Special Agent
                                            _Printed name and title_

Sworn to before me and signed in my presence.

Date:    8/13/19                                        /s/
                                            _Judge's signature_

City and state:      Los Angeles, California        The Honorable John E. McDermott
                                            _Printed name and title_

**Attachment to Complaint**

Count One (18 U.S.C. § 1343)

Beginning on an unknown date, and continuing through at least on or about July 13, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant ADAM JOINER ("JOINER"), knowingly and with the intent to defraud, devised, participated in, executed, and attempted to execute a scheme to defraud as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, promises, and the concealment of material facts. The scheme to defraud was carried out in substance as follows: Defendant JOINER would solicit financial investments in film projects from potential investors, such as Korea Investment Partners Co., Ltd. and Star Century Pictures Co., Ltd. Through oral statements and written materials, defendant JOINER would represent to the potential investors that established film distributors, such as Netflix and Amblin, had agreed to distribute the film projects he was producing through his company, Dark Planet Pictures, LLC, and for which he sought the financial investments. The representations were false and concealed material facts because, among other things, the film distributors had not agreed to distribute the films. Defendant JOINER would create and distribute to the potential investors fabricated agreements with the film distributors that used the names of real persons. In reliance on defendant JOINER's false representations, the potential investors would transfer funds by wire into a bank account under defendant JOINER's control. On or about April 7, 2016, within the Central District of California, and elsewhere, for the purpose of executing the above-described scheme to defraud, defendant JOINER caused the transmission by means of wire communication in foreign commerce an email to Korea Investment Partners Co., Ltd. attaching a purported distribution agreement between Netflix and Dark Planet Pictures, LLC.

Count Two (18 U.S.C. §§ 1957(a); 2(b))

On or about August 12, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant ADAM JOINER, knowing that the funds involved represented the proceeds of some form of unlawful activity, knowingly engaged and willfully caused others to engage in a monetary transaction, affecting interstate commerce, in criminally-derived property of a value greater than $10,000, by transferring approximately $5,192,916 from a Bank of America account ending in 0230 to California Investor Escrow, for the purchase of a residence in Manhattan Beach, California, such property, in fact, having been derived from specified unlawful activity, namely, wire fraud, in violation of Title 18, United States Code, Section 1343.

Count Three (18 U.S.C § 1028A)

On or about April 7, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant ADAM JOINER ("JOINER") knowingly possessed, transferred, and used, without lawful authority, means of identification that defendant JOINER knew belonged to another person, that is, the name and signature of victim T.S., during and in relation to the offense of Wire Fraud, a felony violation of Title 18, United States Code, Section 1343, as charged in Count One of this Complaint.

## **AFFIDAVIT**

I, Nathan Cherney, being duly sworn, declare and state as follows:

## I.   **INTRODUCTION**

1.     I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since January 2018. I am currently assigned to a Complex Financial Crime squad of the FBI's Los Angeles Field Office, which is responsible for investigating corporate and securities fraud, including mail fraud, wire fraud, securities fraud, and insider trading.

2.     Since becoming an FBI Special Agent in 2018, I have received approximately 19 weeks of formal training at the FBI Training Academy in Quantico, Virginia, in financial analysis, interviewing, surveillance, and other investigative techniques. In June 2019, I also attended a multi-day Securities Industry Essentials formal training sponsored by the FBI Economics Crimes Unit. At this training, I received formal training essential to securities industry markets, regulatory agencies and their functions, and prohibited practices. Before joining the FBI, I performed numerous financial audits while employed as an auditor at a public accounting firm for approximately three years. I participated in many aspects of the audits including, but not limited to, procedures for fraud detection, financial analysis, and reviews of accounting and bank records. I received approximately eight weeks of formal training from the accounting firm including, but not limited to, fraud, accounting principles, financial analysis, and auditing principles. I hold a Bachelor of Arts degree in Economics from the University of Michigan and a Master of Science in Accounting from Michigan State University. I am currently a Certified Public Accountant in the state of California.

3.     In addition to my formal training and personal experience, I have learned from and worked alongside numerous senior FBI agents with years of experience in various criminal investigations including, but not limited to corporate and securities fraud, mail fraud, wire fraud, securities fraud, and insider trading. Throughout my experiences with these senior agents, I have received guidance, training, and hands on experience in various investigative techniques

including but not limited to, interviewing, surveillance, financial analysis, and other investigative techniques, including with respect to the identification and tracing of illicit proceeds.

## II.  **PURPOSE OF AFFIDAVIT**

4.      This affidavit is made in support of a criminal complaint and arrest warrant for ADAM JOINER for wire fraud, engaging in transactions with criminally involved property, and aggravated identity theft, in violation of a violation of 18 U.S.C. §§ 1343, 1957, and 1028A, as well as an application for a search warrant for 441 3rd Street, Manhattan Beach, California 90266 (the "SUBJECT PREMISES"), described in Attachment A, for the items described in Attachment B.

5.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III.  **PREMISES TO BE SEARCHED**

6.      The SUBJECT PREMISES is the property described in Attachment A, which is incorporated herein by reference.

## IV.  **ITEMS TO BE SEIZED**

7.      The items to be seized, which are the evidence, fruits, and instrumentalities of violations of wire fraud, money laundering, and aggravated identity theft, in violation of 18 U.S.C. §§ 1343, 1956, 1957, and 1028A, are set forth in Attachment B, which is incorporated herein by reference.

## V.  **STATEMENT OF PROBABLE CAUSE**

8.      My investigation has shown that ADAM JOINER orchestrated a fraud scheme in which he made false representations—and employed forged documents—to convince foreign investment firms to invest millions in a film project dubbed *Legends*. JOINER repeatedly

2

claimed to have entered distribution agreements with major film distributors, such as Netflix, Inc., and Storyteller Distribution Co., LLC, doing business as Amblin Partners ("Amblin"), and even presented to the investors documents he claimed were executed agreements. In reality, he had entered into no such distribution agreements and had done little to no work in producing a film using the investment funds he was provided. Instead, he spent much of the money on himself, including buying a house in Manhattan Beach for over $5 million.

9.      From my review of bank records, I know that there is a bank account ending in -0230 held at Bank of America in Manhattan Beach, California, in the name of "Legends Film Co, LLC" (the "*Legends* Bank Account"), and that JOINER was the sole signatory on the bank account.

**A.      Korean Investment Firm Invests Millions Based on JOINER's False Representation**

10.     Based on my investigation to date and review of publicly available records, Korea Investment Global Contents Fund ("KIGCF") is an investment fund based in South Korea. Its assets are managed by Korean Investment Partners Co., Ltd. ("KIP").

11.     I have personally interviewed Paul Huh, who worked as a director with KIP from May 2015 to October 2017, as well as Yosep Jeon, executive director at KIP and formerly Huh's supervisor. KIP, through its attorneys, has also provided me with copies of email correspondence. Based on these interviews and my review of the emails and publicly available records, I know the following:

a.      In late 2015, John Yi, an acquaintance of Paul Huh, introduced him to JOINER, who owned a film production company called Dark Planet Pictures, LLC. JOINER claimed to be seeking investment money to produce a film called *Legends*:[1] an anachronistic mash-up of legendary and historical figures from nineteenth century America, such as Davy Crockett, Calamity Jane, Paul Bunyan, and John Henry. Huh was furnished with a screenplay for *Legends*, written by JOINER's brother, Andrew Joiner. Huh and JOINER communicated by

---

[1] Huh recalled that JOINER informed him in 2017 that the name of *Legends* would be changed to *Folkwar*.

email and telephone and also met in person. Based on their residences and the contents of many of their communications referencing locations, Huh was generally based in South Korea and JOINER in Southern California during the telephone and email communications.

b.    Eventually, JOINER informed Huh that Netflix had expressed interest in distributing *Legends*.

i.    For example, on February 9, 2016, JOINER emailed Huh to tell him that "things have begun to pick up steam with Netflix as a potential distributor of the film. I have another meeting with them this week."

ii.    On February 12, 2016, JOINER sent Huh a follow-up email telling him, "On Netflix, I had another good meeting with them yesterday and expect to receive a contract from them by the end of the week."

c.    Before KIP representatives signed off on an agreement to invest in *Legends*, Huh pressed JOINER to provide a copy of the latter's distribution agreement with Netflix. On April 5, 2016, for instance, Huh emailed JOINER, instructing him, "Per our conversation, please ask . . . someone at Netflix to fax it again tomorrow and also send it to the gmail accounts below from Netflix domain email." The following day, Huh wrote again, saying, "In regards to validation on closing of the agreement between Netflix and [Dark Planet Pictures] on Legends[,] [p]lease make sure that we have it in both fax and email by our tomorrow morning."

d.    On April 7, 2016, Paul Huh received a fax bearing a Netflix cover sheet. Included in the transmission was a letter, dated April 5, 2016, purporting to "confirm that an agreement between Netflix, Inc and Dark Planet Pictures, LLC was executed March 31st 2016." The letter was signed by an individual identified as "Vice President, Business & Legal Affairs/Content Acquisition" ("Executive 1"). That same day, JOINER also forwarded an email, purportedly from Executive 1, using an email address from a Netflix email domain, that attached a purported distribution agreement between Netflix and Dark Planet Pictures.

e.      Similarly, JOINER forwarded Huh an email chain on April 8, 2016, with the purported distribution agreement attached. The chain included a purported email from a Netflix Vice President ("Executive 2") stating, "Look forward to making this movie!"

f.      The distribution agreement, dated March 31, 2016, and attached to the April 7 and April 8 emails described above, was signed by JOINER on behalf of Dark Planet Pictures. On behalf of Netflix, the agreement was purportedly signed by the Chief Content Officer for Netflix ("Executive 3").

i.      I interviewed Executive 1 by telephone on August 5, 2019, at which time I reviewed with him both the fax and email chain he had purportedly signed. Executive 1 had worked at Viacom as Vice President of Business & Legal Affairs for Content Distribution, and while he had done some limited contract work with Netflix, he had never been directly employed by Netflix. Executive 1 confirmed that he did not know JOINER, that he had no knowledge of Dark Planet Pictures, that the signature from the fax was not his, and that he had neither sent nor received the email chain.

ii.      I interviewed Executive 2 in person on June 19, 2019. Executive 2 had, in fact, previously served as Vice President for Content at Netflix at the time of the purported distribution agreement. Executive 2 confirmed that he never met or communicated with JOINER or his brother, and that he had no knowledge of Netflix ever participating in talks to distribute a film called *Legends* or doing business with Dark Planet Pictures.

iii.      I interviewed Executive 3 in person on June 26, 2019, at which time I showed him a copy of the purported distribution agreement between Netflix and Dark Planet Pictures. Executive 3 confirmed that the signature was not his, that the document was not consistent with distribution agreements Netflix used, and that he rarely signed such documents during the time period of March 2016. Executive 3 did not recognize the name of JOINER, his brother, Dark Planet Pictures, or *Legends*, and had no record of Netflix doing business with any of them.

12.     I have reviewed a formal investment agreement that KIGCF and Dark Planet entered into on April 9, 2016. As part of the terms, KIGCF agreed to invest at least $8 million by depositing it the *Legends* Bank Account. Paragraph 8(2)(e) of the agreement specifies that the "existence of the Distribution Agreement between [Dark Planet] and Netflix, Inc. is a material basis for [KIP's] decision to invest in the Motion Picture." JOINER signed the agreement on behalf of both Legends Film Co, LLC and Dark Planet Pictures, LLC.

13.     Based on my review of records for the *Legends* Bank Account, I know that KIP caused KIGCF to wire $4 million—the first half of its investment—into the account on April 14, 2016.

**B.     Chinese Investment Firm Invests Millions Based on JOINER's Misrepresentations**

14.     Based on my investigation to date and review of publicly available records, Star Century Pictures Co., Ltd. ("Star Century") is an investment firm based in the People's Republic of China. PGA Yungpark Capital Ltd ("Yungpark") is an affiliate of Star Century.

15.     Based on my review of publicly available documents, I learned that, the month after receiving the first $4 million installment from KIGCF in April 2016, JOINER engaged in similar fraudulent conduct with Star Century:

a.     On May 25, 2016, Star Century and Yungpark entered into an investment agreement, which I have also reviewed, with JOINER acting on behalf of Dark Planet and Legends Film Co. Paragraph 9(2)(e) of the investment agreement specifies that the "existence of the Distribution Agreement, under which [Netflix] is committed to acquire the distribution right to the Motion Picture . . . is a material basis for [Star Century's] decision to invest in the Motion Picture." Appended to the investment agreement as "Exhibit A" was the same fraudulent distribution agreement provided to KIP and purportedly signed by Executive 3. Yungpark wired $6 million into the *Legends* Bank Account a few days later on June 3, 2016.

**C.      Defendant Continues to Lie After Initial Investments by KIGCF and Yungpark**

16.     From my review of emails provided by KIP, I know that, subsequent to these investments, JOINER continued to provide updates concerning the supposed status of *Legends* film production:

a.      For example, on June 29, 2016, JOINER informed Huh by email, "[W]e are expecting to secure Don Murphy by this Friday to be our 'name' Producer for the film. Don has done all of the Transformers movies and several others. He has discussed wanting to bring in Michael Bay to direct so we plan to explore that."

b.      In another email, dated October 1, 2016, JOINER wrote Paul Huh from KIP and Ma Xue from Star Century, "Director: We agreed to terms verbally yesterday with Guillermo del Toro and his agent."

i.      On August 9, 2019, I interviewed Don Murphy in person. He explained to me that he had, in fact, been retained by JOINER to produce his film (now called *Folkwar*) and verified that he had entered into a Producer Agreement with JOINER dated December 19, 2016, with Murphy to receive $1.2 million for his services. Murphy noted that, because JOINER did not have an established track record of successful film production, the agreement was crafted to involve the use of an escrow account and an initial payment of $600,000 upon execution of the agreement. That $600,000 payment was made.

ii.      Murphy stated that JOINER had not indicated that any film distributor was on board to distribute his movie. Indeed, one of the services Murphy would be expected to render as producer would be securing a distributor for the film. Though Murphy had taken steps toward the production of the film, such as contacting agents and film talent, no actor or director had committed to the film—including Guillermo del Toro. Eventually, JOINER notified him that he would be closing the escrow account, and to mitigate the risk of loss, Murphy had JOINER transfer him $200,000 from the escrow account.

iii.    Murphy explained that the film never reached the preproduction stage, nor was any distributor ever secured. He stated that, around the summer of 2017, he had emailed JOINER to end their business relationship and has not heard from JOINER since.

c.    JOINER eventually informed KIP representatives that he was attempting to bring on Amblin to replace Netflix as film distributor for *Legends*. On December 2, 2016, John Yi emailed KIP personnel a purported "memorandum of understanding" between Dark Planet Pictures and Amblin and dated December 1, 2016. The memorandum of understanding provided that Amblin would distribute *Legends*, and the document contained supposed signatures from JOINER and Amblin's CEO ("Executive 4").

i.    I interviewed Executive 4 by telephone on May 29, 2019. Executive 4 is currently the President of Epix but was, in fact, CEO of Amblin from November 1, 2014, until September or October 2017. Executive 4 did not know JOINER, Dark Planet Pictures, or *Legends*, and verified that he had never entered into any contracts concerning them. Executive 4 also reviewed the memorandum of understanding and confirmed the signature it bore was not his.

d.    JOINER also sent John Yi a "Termination Agreement" supposedly terminating the distribution agreement between Dark Planet Pictures and Netflix as of December 19, 2016. Yi forwarded the "Termination Agreement" to KIP personnel by email on December 21, 2016. This document bore a signature for Executive 2 as well as JOINER.

i.    As mentioned above, I interviewed Executive 2. He explained to me that not only was this letter a forgery, but that the time frame made no sense: Executive 2's employment with Netflix ended on December 1, 2016, and he had physically left the office several weeks prior to that date.

17.    Based on the representations concerning the new distribution agreement with Amblin, KIGCF entered a "first amendment" to its original investment agreement with Dark Planet Pictures. Paragraph 2.3(e) of the first amendment specifies, "The existence of the

Distribution Agreement between [Dark Planet] and Storyteller Distribution Co, LLC is a material basis for [KIP's] decision to invest in the Motion Picture."

18.     From my review of bank records, I know that KIGCF wired an additional $4 million into the *Legends* Bank Account on January 11, 2017.

**D.     The Fraud Revealed**

19.     In the months after this wire transfer, JOINER provided excuses for delays in filming along with assurances that he could reimburse investors' money. Through my review of emails provided by KIP, I learned the following:

a.     On March 22, 2017, JOINER emailed Paul Huh with a status update and attached a bank statement for his *Legends* Bank Account. For the period of February 8, 2017, to March 7, 2017, it reported a balance of $11,799,670.55.

i.     In reviewing records for the *Legends* Bank Account, I have verified that the statement JOINER emailed on March 22, 2017, was a forgery. The true statement for that account—which actually spans February 1 to February 28—shows a balance of just $32,628.93 for the month.

b.     On March 31, JOINER emailed Huh to explain that filming was delayed because of "internal politics with Amblin/Universal"—"[o]nce Bradley Cooper turned down the agreement with Universal . . . Universal decided to refuse payment to Amblin."

c.     Eventually, KIP requested that its investment be refunded, and JOINER agreed in an April 10, 2017, email that the funds could be returned "immediately."

d.     JOINER and KIP entered into a second amendment to the investment agreement, which I reviewed, with JOINER agreeing to return the $8 million KIP had invested in *Legends*. The effective date of the agreement is May 8, 2017.

e.     JOINER, however, did not return the funds. KIP made efforts to investigate through John Yi, which resulted in JOINER emailing John Yi on July 13, 2017. In the email, JOINER stated, "I understand you attempted to contact Don Murphy and his office

this afternoon. Please cease and desist any attempts at contacting Mr. Murphy, whether in person or by phone, or it shall be deemed harassment."

**E.     Financial Records**

20.     As set forth above, I have reviewed bank records for the *Legends* Bank Account and confirmed the following wire transfers:

a.     April 14, 2016, deposit of $4 million from KIGCF (before this transfer, the balance on the account was the $100 deposited upon its being opened on January 4, 2016);

b.     June 3, 2016, deposit of $6 million from Yungpark; and

c.     January 11, 2017, deposit of $4 million from KIGCF.

I have confirmed with Bank of America that these transfers originated from outside the United States—South Korea, in the case of KIGCF and China, in the case of Yungpark.

21.     Other than the foregoing international wire transfers, the only deposits into the *Legends* Bank Account that I saw from January 2016 through March 2017 were a $10,000 transfer from an account in the name of Allison Joiner, whom I believe to be JOINER's wife based on my review of law enforcement databases; a document submitted to California Investors Escrow June 28, 2016, that was signed by JOINER and Allison Joiner in which they indicated that they were husband and wife; and records for their Bank of America joint checking account. The account also shows a $600,000 counter credit from August 12, 2016, that appears to represent a recalled check for the same amount that was listed as a customer withdrawal on July 26, 2016.

22.     In reviewing records for this account, I have also observed several withdrawals and debits that appear unrelated to the production of the film *Legends*. These include:

a.     April 15, 2016, transfer of $800,000 to a joint account in the names of JOINER and Allison Joiner;

b.     June 27, 2016, transfer of $160,500, to California Investor Escrow. My review of documents obtained from California Investor Escrow indicates that this was a security deposit for the purchase of the SUBJECT PREMISES;

c.      August 12, 2016, transfer of $5,192,916.92 to California Investor Escrow. My review of documents obtained from California Investor Escrow indicates that this transfer was the balance of the amount owed for the purchase of the SUBJECT PREMISES;

d.      September 21, 2016, transfer of $120,000 to a joint account in the names of JOINER and Allison Joiner;;

e.      January 13, 2017, transfer of $4,300,000 to another bank account in the name of Stock Car Willie, LLC;[2]

f.      January 30, 2017, transfer of $60,000 to another bank account in the name of Stock Car Willie, LLC;

g.      June 2, 2017, transfer of $400,000 to a joint account in the names of JOINER and Allison Joiner; and

h.      June 9, 2017, transfer of $25,000 to a joint account in the names of JOINER and Allison Joiner.

F.      **JOINER's Connection to the SUBJECT PREMISES**

23.      As described above, JOINER's bank and escrow records show that he purchased the SUBJECT PREMISES in August 2016. Los Angeles County Registrar records also indicated that the deed to the SUBJECT PREMISES had been filed in August 2016 under JOINER's name.

24.      On July 18, 2019, I conducted surveillance at the SUBJECT PREMISES after familiarizing myself with JOINER's appearance based on his California Department of Motor Vehicles photograph and physical descriptions I have previously received. During surveillance, I saw an individual walk onto a balcony of the SUBJECT PREMISES in the morning whom I recognized to be JOINER.

---

[2] From my review of Bank of America records for this account, I learned that it was opened on October 21, 2016, and that JOINER was listed as the sole signer. The film website IMDb also lists an entry for a film called *Stock Car Willie*, and provides the following synopsis: "An African-American driver turns the world of NASCAR upside down." https://www.imdb.com/title/tt5753852/plotsummary. *Stock Car Willie* is listed as in development.

25.     On August 5, 2019, I reviewed records from a law enforcement database, which indicated that JOINER was still in control of the SUBJECT PREMISES. Based on my review of financial and property records and the surveillance I conducted, I believe JOINER still lives at the SUBJECT PREMISES.

**G.     Training and Experience in Investigating Financial Offenses**

26.     Based on my training and experience, and information from other experienced investigators of fraud offenses, I know the following:

a.     Individuals involved in fraud schemes often use the proceeds of the fraud to purchase expensive items, or store the proceeds in the form of cash to make it more difficult to trace.

b.     Typically, individuals involved in fraud schemes maintain evidence where it is close at hand and safe, such as in their residences, vehicles, and digital devices, which are also commonly stored in their residences and vehicles. Indeed, in this case, JOINER appears to have made substantial use of digital devices to communicate in furtherance of the scheme by email. I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded. Computers, tablets and cell phones can be used to communicate between co-conspirators and may contain information relating to the crime under investigation. And, even when those who use digital devices to commit fraud do upgrade them, they often transfer data across devices, such as contact lists, email and text communications, and documentary records.

c.     Individuals involved in fraud frequently keep the most damaging evidence and/or proceeds of the scheme at their residences and in their vehicles to help conceal the fraud from third parties, such as coworkers who may have access to such documents at the workplace. Proceeds such as cash and gifts are easier to conceal at the fraudster's residence rather than in plain view of coworkers.

12

d.      More sophisticated or cagey criminals may rent public storage units, safe deposit boxes, or other third-party space to further distance themselves from incriminating evidence or to hide their illicit profits from law enforcement or civil litigants. Such individuals typically maintain items relating to those third-party locations at their homes, such as keys, addresses, and leasing documents.

27.      The requested search warrant seeks not only to seize evidence of crimes but also the "fruits of crime" and "property designed for use, intended for use, or used in committing a crime." Fed. R. Crim. P. 41(c). Even long after a crime has been completed, the illicit proceeds of a crime often still exist, frequently secreted in forms or locations difficult to detect by law enforcement. For that reason, there is probable cause to seize evidence pertaining to JOINER's current assets, such as his ownership of the SUBJECT PREMISES, which was purchased using funds derived from his investment fraud scheme.

**H.      Summary of Criminal Charges**

28.      Based on the foregoing facts, I submit that there is probable cause to charge the following crimes:

a.      **Wire Fraud:** As described above, on April 7, 2016, JOINER knowingly and with intent to defraud caused an email to be sent to Paul Huh in South Korea that attached the forged distribution agreement with Netflix. In reality, JOINER had entered into no such agreement with Netflix to distribute *Legends*.

b.      **Engaging in Financial Transactions with Criminal Proceeds:** By transferring $5,192,916.32 from the *Legends* Bank Account to California Investor Escrow on August 12, 2016, to purchase the SUBJECT PREMISES, JOINER engaged in a monetary transaction affecting interstate commerce in criminally derived property of more than $10,000. At the time, only $10,100 in the *Legends* Bank Account was derived from sources other than KIGCF or Yungpark.

c.      **Aggravated Identity Theft:** JOINER knowingly used the name of Executive 3—whose initials are T.S.—in connection with the wire fraud described above by

representing, through the forged Netflix distribution agreement, that Executive 3 had signed the agreement.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[3]

29.     Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.     Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.     Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.     The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.     Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

      30.     Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      e.     Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      f.     Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

31.     The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

g.     Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

h.     In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

i.     Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress JOINER's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of JOINER's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

32.     Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  **CONCLUSION**

33.     For all the reasons described above, there is probable cause to believe that ADAM JOINER has committed wire fraud, engaging in transactions with criminally involved property, and aggravated identity theft, in violation of a violation of 18 U.S.C. §§ 1343, 1957, and 1028A,

and that evidence, contraband, fruits, or instrumentalities of acts of wire fraud, money

laundering, and aggravated identity theft, in violation of 18 U.S.C. §§ 1343, 1956, 1957, and

1028A, as described above and in Attachment B of this affidavit, will be found in a search of the

SUBJECT PREMISES, as further described above and in Attachment A of this affidavit.


NATHAN CHERNEY, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this _____ day of August, 2019.


THE HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE

**Exhibit 2**

FILED

1 | NICOLA T. HANNA                2019 SEP 16   AM 11: 26
United States Attorney
2 | BRANDON D. FOX
Assistant United States Attorney
3 | Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
4 | Assistant United States Attorney
Major Frauds Section
5 |     1100 United States Courthouse
312 North Spring Street
6 |     Los Angeles, California 90012
Telephone: (213) 894-1259
7 |     Facsimile: (213) 894-0141
E-mail:   alexander.schwab@usdoj.gov
8 |
Attorneys for Plaintiff
9 | UNITED STATES OF AMERICA

10 |                UNITED STATES DISTRICT COURT

11 |          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12 | UNITED STATES OF AMERICA,          No 19CR00541-AB

13 |          Plaintiff,               PLEA AGREEMENT FOR DEFENDANT
ADAM JOINER
14 |          v.

15 | ADAM JOINER,

16 |          Defendant.

17 |

18 |     1.    This constitutes the plea agreement between ADAM JOINER

19 | ("defendant") and the United States Attorney's Office for the Central

20 | District of California (the "USAO") in an investigation of wire

21 | fraud.   This agreement is limited to the USAO and cannot bind any

22 | other federal, state, local, or foreign prosecuting, enforcement,

23 | administrative, or regulatory authority.

24 |                     DEFENDANT'S OBLIGATIONS

25 |     2.    Defendant agrees to:

26 |          a.    Give up the right to indictment by a grand jury and,

27 | at the earliest opportunity requested by the USAO and provided by the

28 | Court, appear and plead guilty to count one of the information in the

1   form attached to this agreement as Exhibit A or a substantially

2   similar form, which charges defendant with wire fraud, in violation

3   of 18 U.S.C. § 1343.

4           b.   Not contest facts agreed to in this agreement.

5           c.   Abide by all agreements regarding sentencing contained

6   in this agreement.

7           d.   Appear for all court appearances, surrender as ordered

8   for service of sentence, obey all conditions of any bond, and obey

9   any other ongoing court order in this matter.

10          e.   Not commit any crime; however, offenses that would be

11  excluded for sentencing purposes under United States Sentencing

12  Guidelines ("USSG" or "Sentencing Guidelines") § 4A1.2(c) are not

13  within the scope of this agreement.

14          f.   Be truthful at all times with the United States

15  Probation and Pretrial Services Office and the Court.

16          g.   Pay the applicable special assessment at or before the

17  time of sentencing unless defendant lacks the ability to pay and

18  prior to sentencing submits a completed financial statement on a form

19  to be provided by the USAO.

20          h.   Not seek the discharge of any restitution obligation,

21  in whole or in part, in any present or future bankruptcy proceeding.

22                  FORFEITURE AND FINANCIAL ACCOUNTABILITY

23      3.   Defendant further agrees:

24          a.   To forfeit all right, title, and interest in and to

25  any and all monies, properties, and/or assets of any kind, derived

26  from or acquired as a result of, or used to facilitate the commission

27  of, or involved in the illegal activity to which defendant is

28  pleading guilty (the "Forfeitable Assets").

2

b.    To the Court's entry of an order of forfeiture at or before sentencing with respect to the Forfeitable Assets and to the forfeiture of the assets.

c.    To take whatever steps are necessary to pass to the United States clear title to the Forfeitable Assets, including, without limitation, the execution of a consent decree of forfeiture and the completion of any other legal documents required for the transfer of title to the United States.

d.    Not to contest any administrative forfeiture proceedings or civil judicial proceedings commenced against the Forfeitable Assets.  If defendant submitted a claim and/or petition for remission for all or part of the Forfeitable Assets on behalf of himself or any other individual or entity, defendant shall and hereby does withdraw any such claims or petitions, and further agrees to waive any right he may have to seek remission or mitigation of the forfeiture of the Forfeitable Assets.

e.    Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Assets.

f.    Not to claim that reasonable cause to seize the Forfeitable Assets was lacking.

g.    To prevent the transfer, sale, destruction, or loss of any and all assets described above to the extent defendant has the ability to do so.

h.    To fill out and deliver to the USAO a completed financial statement listing defendant's assets on a form provided by the USAO.

i.    That forfeiture of Forfeitable Assets shall not be counted toward satisfaction of any special assessment, fine,

1    restitution, costs, or other penalty the Court may impose.

2                    THE USAO'S OBLIGATIONS

3        4.    The USAO agrees to:

4              a.    Not contest facts agreed to in this agreement.

5              b.    Abide by all agreements regarding sentencing contained

6    in this agreement.

7              c.    At the time of sentencing, move to dismiss the

8    remaining counts of the information as against defendant.  Defendant

9    agrees, however, that at the time of sentencing the Court may

10   consider any dismissed charges in determining the applicable

11   Sentencing Guidelines range, the propriety and extent of any

12   departure from that range, and the sentence to be imposed.

13             d.    At the time of sentencing, provided that defendant

14   demonstrates an acceptance of responsibility for the offense up to

15   and including the time of sentencing, recommend a two-level reduction

16   in the applicable Sentencing Guidelines offense level, pursuant to

17   USSG § 3E1.1, and recommend and, if necessary, move for an additional

18   one-level reduction if available under that section.

19             e.    Recommend that defendant be sentenced to a term of

20   imprisonment no higher than the low end of the applicable Sentencing

21   Guidelines range, provided that the offense level used by the Court

22   to determine that range is 24 or higher and provided that the Court

23   does not depart downward in offense level or criminal history

24   category.  For purposes of this agreement, the low end of the

25   Sentencing Guidelines range is that defined by the Sentencing Table

26   in USSG Chapter 5, Part A, without regard to reductions in the term

27   of imprisonment that may be permissible through the substitution of

28   community confinement or home detention as a result of the offense

                                4

1  level falling within Zone B or Zone C of the Sentencing Table.

2  <u>NATURE OF THE OFFENSE</u>

3      5.   Defendant understands that for defendant to be guilty of

4  the crime charged in the count one of the information, that is, wire

5  fraud, in violation of 18 U.S.C. § 1343, the following must be true:

6  (1) defendant knowingly participated in, devised, or intended to

7  devise a scheme or plan to defraud, or a scheme or plan for obtaining

8  money or property by means of false or fraudulent pretenses,

9  representations, or promises, or omitted facts; (2) the statements

10  made or facts omitted as part of the scheme were material, that is,

11  they had a natural tendency to influence, or were capable of

12  influencing, a person to part with money or property; (3) defendant

13  acted with the intent to defraud, that is, the intent to deceive or

14  cheat; and (4) defendant used, or caused to be used, an interstate or

15  foreign wire communication to carry out or attempt to carry out an

16  essential part of the scheme.

17  <u>PENALTIES AND RESTITUTION</u>

18      6.   Defendant understands that the statutory maximum sentence

19  that the Court can impose for a violation of 18 U.S.C. § 1343, is:

20  twenty years' imprisonment; a three-year period of supervised

21  release; a fine of $250,000 or twice the gross gain or gross loss

22  resulting from the offense, whichever is greatest; and a mandatory

23  special assessment of $100.

24      7.   Defendant understands that supervised release is a period

25  of time following imprisonment during which defendant will be subject

26  to various restrictions and requirements.  Defendant understands that

27  if defendant violates one or more of the conditions of any supervised

28  release imposed, defendant may be returned to prison for all or part

1  of the term of supervised release authorized by statute for the

2  offense that resulted in the term of supervised release, which could

3  result in defendant serving a total term of imprisonment greater than

4  the statutory maximum stated above.

5      8.    Defendant understands that defendant will be required to

6  pay full restitution to the victims of the offense to which defendant

7  is pleading guilty.  Defendant agrees that, in return for the USAO's

8  compliance with its obligations under this agreement, the Court may

9  order restitution to persons other than the victims of the offenses

10 to which defendant is pleading guilty and in amounts greater than

11 those alleged in the count to which defendant is pleading guilty.   In

12 particular, defendant agrees that the Court may order restitution to

13 any victim of any of the following for any losses suffered by that

14 victim as a result: (a) any relevant conduct, as defined in USSG

15 § 1B1.3, in connection with the offense to which defendant is

16 pleading guilty; and (b) any counts dismissed or charges not

17 prosecuted pursuant to this agreement as well as all relevant

18 conduct, as defined in USSG § 1B1.3, in connection with those counts

19 or charges.  The parties currently believe that the applicable amount

20 of restitution is approximately $14 million, but recognize and agree

21 that this amount could change based on facts that come to the

22 attention of the parties prior to sentencing

23     9.    Defendant understands that, by pleading guilty, defendant

24 may be giving up valuable government benefits and valuable civic

25 rights, such as the right to vote, the right to possess a firearm,

26 the right to hold office, and the right to serve on a jury.

27 Defendant understands that once the Court accepts defendant's guilty

28 plea, it will be a federal felony for defendant to possess a firearm

1   or ammunition.  Defendant understands that the conviction in this

2   case may also subject defendant to various other collateral

3   consequences, including but not limited to revocation of probation,

4   parole, or supervised release in another case and suspension or

5   revocation of a professional license.  Defendant understands that

6   unanticipated collateral consequences will not serve as grounds to

7   withdraw defendant's guilty plea.

8       10.  Defendant understands that, if defendant is not a United

9   States citizen, the felony conviction in this case may subject

10  defendant to: removal, also known as deportation, which may, under

11  some circumstances, be mandatory; denial of citizenship; and denial

12  of admission to the United States in the future.  The Court cannot,

13  and defendant's attorney also may not be able to, advise defendant

14  fully regarding the immigration consequences of the felony conviction

15  in this case.  Defendant understands that unexpected immigration

16  consequences will not serve as grounds to withdraw defendant's guilty

17  plea.

18                              FACTUAL BASIS

19      11.  Defendant admits that defendant is, in fact, guilty of the

20  offense to which defendant is agreeing to plead guilty.  Defendant

21  and the USAO agree to the statement of facts provided below and agree

22  that this statement of facts is sufficient to support a plea of

23  guilty to the charge described in this agreement and to establish the

24  Sentencing Guidelines factors set forth in paragraph 13 below but is

25  not meant to be a complete recitation of all facts relevant to the

26  underlying criminal conduct or all facts known to either party that

27  relate to that conduct.

28      Beginning on an unknown date, and continuing through at least

7

1    July 13 2017, in Los Angeles County, within the Central District of

2    California, and elsewhere, defendant knowingly and with the intend to

3    defraud devised and executed a scheme to defraud potential investors

4    as to material matters, and to obtain money and property from the

5    potential investors by means of material false and fraudulent

6    pretenses, representations, and promises, and the concealment of

7    material facts.  Defendant would represent to potential investors

8    that he was seeking financial backing for a film he was producing

9    called Legends.  To convince the potential investors to back the

10   film, defendant would falsely represent that major film distributors,

11   including Netflix and Amblin/Storyteller, had agreed to distribute

12   Legends and send them fabricated distribution agreements purporting

13   to verify his false representations.  These false distribution

14   agreements used the names and sometimes purported signatures of real

15   persons associated with the film distributors.  In reality, as

16   defendant knew, no such agreements had been made, his representations

17   were false, and the distribution agreements were fraudulent and the

18   signatures on them were forgeries.  In reliance on these fabricated

19   distribution agreements, the potential investors would enter into

20   investment agreements with defendant and transfer funds to a bank

21   account under his control.

22        In furtherance of the scheme, defendant sought funding from

23   Korean Investment Partners Co., Ltd. ("KIP"), which managed the

24   assets of Korea Investment Global Contents Fund ("KIGCF"), an

25   investment fund based in South Korea.  On or about April 8, 2016,

26   defendant forwarded an email chain -- thereby making use of an

27   international wire communication -- to a KIP executive located in

28   South Korea.  The email chain included a purported email from a

1   Netflix Vice President, whose initials are S.C., stating, "Look

2   forward to making this movie!"  This email was a forgery.  The email

3   chain also included, as an attachment, a purported distribution

4   agreement between defendant's company -- Dark Planet Pictures -- and

5   Netflix.  The distribution agreement, which also was a forgery,

6   included the name and a purported signature from an individual whose

7   initials are T.S. and who was the Chief Content Officer for Netflix.

8   At the time he sent them to KIP, defendant knew T.S. and S.C. to be

9   real people, and knew the email chain and distribution agreements to

10  be fabricated.  Defendant submitted the same fraudulent distribution

11  agreement with the purported signature of T.S. to Star Century

12  Pictures Co., Ltd. ("Star Century"), which was a Chinese investment

13  firm, and PGA Yungpark Capital Ltd ("Yungpark"), which was an

14  affiliate of Star Century.  In reality, defendant had no distribution

15  agreement with Netflix.

16          After sending the false distribution agreement to KIP and Star

17  Century, defendant continued to provide false updates concerning the

18  film which were designed to lull KIP and Star Century into believing

19  his earlier false representations.  For example, on October 1, 2016,

20  defendant emailed representatives from both investment firms stating

21  "We agreed to terms verbally yesterday with Guillermo del Toro and

22  his agent."  Eventually, defendant informed KIP representatives that

23  he was attempting to bring on Storyteller Distribution Co., LLC,

24  doing business as Amblin Partners ("Amblin"), to replace Netflix to

25  distribute Legends.  On December 2, 2016, defendant caused a third

26  party to email KIP personnel a purported "memorandum of

27  understanding" between Dark Planet Pictures and Amblin that was dated

28  December 1, 2016.  The memorandum of understanding provided that

1    Amblin would distribute Legends, and the document contained a
2    supposed signature from M.W., a real individual who was Amblin's CEO.
3    Again, defendant knew this purported agreement to be a forgery at the
4    time he sent it to KIP as he, in fact, had no such agreement with
5    Amblin.
6        Based on the fraudulent material representations defendant made,
7    KIGCF and Yungpark agreed to invest in Legends and wired money into a
8    Bank of America account ending -0230 in the name "Legends Film Co,
9    LLC" that defendant controlled ("Legends Bank of America account").
10   These wirings included an April 14, 2016, deposit for $4 million from
11   KIGCF; a June 3, 2016, deposit for $6 million from Yungpark; and
12   another $4 million deposit from KIGCF on January 11, 2017.
13       With the funds defendant received into his Legends Bank of
14   America account from KIGCF and Yungpark, defendant caused the
15   following financial transactions to occur:
16   •   April 15, 2016, transfer of $800,000 to defendant's joint
17       account with his wife (the "Joint Account");
18   •   June 27, 2016, transfer of $160,500, to California Investor
19       Escrow as a security deposit for the purchase of a house in
20       Manhattan Beach;
21   •   August 12, 2016, transfer of $5,192,916.92 to California
22       Investor Escrow to pay for the balance of the amount owed for
23       the purchase of the house in Manhattan Beach;
24   •   September 21, 2016, transfer of $120,000 to the Joint
25       Account;
26   •   January 13, 2017, transfer of $4,300,000 to another bank
27       account in the name of Stock Car Willie, LLC;
28

1      • January 30, 2017, transfer of $60,000 to another bank account
2        in the name of Stock Car Willie, LLC;

3      • June 2, 2017, transfer of $400,000 to the Joint Account; and

4      • June 9, 2017, transfer of $25,000 to the Joint Account.

5      In total, defendant's fraud scheme caused approximately $8
6  million in financial losses to KIGCF and another $6 million in losses
7  to Yungpark for a total of approximately $14 million.

8                          SENTENCING FACTORS

9      12.  Defendant understands that in determining defendant's
10 sentence the Court is required to calculate the applicable Sentencing
11 Guidelines range and to consider that range, possible departures
12 under the Sentencing Guidelines, and the other sentencing factors set
13 forth in 18 U.S.C. § 3553(a).  Defendant understands that the
14 Sentencing Guidelines are advisory only, that defendant cannot have
15 any expectation of receiving a sentence within the calculated
16 Sentencing Guidelines range, and that after considering the
17 Sentencing Guidelines and the other § 3553(a) factors, the Court will
18 be free to exercise its discretion to impose any sentence it finds
19 appropriate up to the maximum set by statute for the crime of
20 conviction.

21     13.  Defendant and the USAO agree to the following applicable
22 Sentencing Guidelines factors:

23     Base Offense Level           7            [USSG § 2B1.1(a)(1)]

24     Loss > $9.5 million         +20          [USSG § 2B1.1(b)(1)(K)]
25 The USAO will agree to a two-level downward adjustment for acceptance
26 of responsibility (and, if applicable, move for an additional one-
27 level downward adjustment under USSG § 3E1.1(b)) only if the
28 conditions set forth in paragraph 4 are met and if defendant has not

                                11

1   committed, and refrains from committing, acts constituting

2   obstruction of justice within the meaning of USSG § 3C1.1, as

3   discussed below.   Subject to paragraph 26 below, defendant and the

4   USAO agree not to seek, argue, or suggest in any way, either orally

5   or in writing, that any other specific offense characteristics or

6   adjustments relating to the offense level be imposed.   Defendant

7   agrees, however, that if, after signing this agreement but prior to

8   sentencing, defendant were to commit an act, or the USAO were to

9   discover a previously undiscovered act committed by defendant prior

10  to signing this agreement, which act, in the judgment of the USAO,

11  constituted obstruction of justice within the meaning of USSG

12  § 3C1.1, the USAO would be free to seek the enhancement set forth in

13  that section and to argue that defendant is not entitled to a

14  downward adjustment for acceptance of responsibility under USSG

15  § 3E1.1.

16      14.  Defendant understands that there is no agreement as to

17  defendant's criminal history or criminal history category.

18      15.  Defendant and the USAO reserve the right to argue for a

19  sentence outside the sentencing range established by the Sentencing

20  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

21  (a)(2), (a)(3), (a)(6), and (a)(7).

22                  WAIVER OF CONSTITUTIONAL RIGHTS

23      16.  Defendant understands that by pleading guilty, defendant

24  gives up the following rights:

25          a.   The right to persist in a plea of not guilty.

26          b.   The right to a speedy and public trial by jury.

27          c.   The right to be represented by counsel -- and if

28  necessary have the Court appoint counsel -- at trial.   Defendant

                                12

1  understands, however, that, defendant retains the right to be

2  represented by counsel -- and if necessary have the Court appoint

3  counsel -- at every other stage of the proceeding.

4          d.   The right to be presumed innocent and to have the

5  burden of proof placed on the government to prove defendant guilty

6  beyond a reasonable doubt.

7          e.   The right to confront and cross-examine witnesses

8  against defendant.

9          f.   The right to testify and to present evidence in

10 opposition to the charges, including the right to compel the

11 attendance of witnesses to testify.

12         g.   The right not to be compelled to testify, and, if

13 defendant chose not to testify or present evidence, to have that

14 choice not be used against defendant.

15         h.   Any and all rights to pursue any affirmative defenses,

16 Fourth Amendment or Fifth Amendment claims, and other pretrial

17 motions that have been filed or could be filed.

18                      WAIVER OF APPEAL OF CONVICTION

19     17.  Defendant understands that, with the exception of an appeal

20 based on a claim that defendant's guilty plea was involuntary, by

21 pleading guilty defendant is waiving and giving up any right to

22 appeal defendant's conviction on the offense to which defendant is

23 pleading guilty.  Defendant understands that this waiver includes,

24 but is not limited to, arguments that the statute to which defendant

25 is pleading guilty is unconstitutional, and any and all claims that

26 the statement of facts provided herein is insufficient to support

27 defendant's plea of guilty.

28

                                    13

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

18.   Defendant agrees that, provided the Court imposes a total term of imprisonment on all counts of conviction of no more than 63 months, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the amount and terms of any restitution order, provided it requires payment of no more than $15 million; (f) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (g) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in General Order 18-10 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

19.   The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment of no less than 51 months, the USAO gives up its right to appeal any portion of the sentence, with the exception that the USAO reserves the right to appeal the following: (a) the amount of restitution ordered if that amount is less than $14 million.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

20.   Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds

1  in withdrawing defendant's guilty plea on any basis other than a

2  claim and finding that entry into this plea agreement was

3  involuntary, then (a) the USAO will be relieved of all of its

4  obligations under this agreement; and (b) should the USAO choose to

5  pursue any charge that was either dismissed or not filed as a result

6  of this agreement, then (i) any applicable statute of limitations

7  will be tolled between the date of defendant's signing of this

8  agreement and the filing commencing any such action; and

9  (ii) defendant waives and gives up all defenses based on the statute

10  of limitations, any claim of pre-indictment delay, or any speedy

11  trial claim with respect to any such action, except to the extent

12  that such defenses existed as of the date of defendant's signing this

13  agreement.

14                 RESULT OF VACATUR, REVERSAL OR SET-ASIDE

15      21.  Defendant agrees that if the count of conviction is

16  vacated, reversed, or set aside, both the USAO and defendant will be

17  released from all their obligations under this agreement.

18                     EFFECTIVE DATE OF AGREEMENT

19      22.  This agreement is effective upon signature and execution of

20  all required certifications by defendant, defendant's counsel, and an

21  Assistant United States Attorney.

22                        BREACH OF AGREEMENT

23      23.  Defendant agrees that if defendant, at any time after the

24  effective date of the agreement, knowingly violates or fails to

25  perform any of defendant's obligations under this agreement ("a

26  breach"), the USAO may declare this agreement breached.  All of

27  defendant's obligations are material, a single breach of this

28  agreement is sufficient for the USAO to declare a breach, and

1    defendant shall not be deemed to have cured a breach without the

2    express agreement of the USAO in writing.   If the USAO declares this

3    agreement breached, and the Court finds such a breach to have

4    occurred, then: (a) if defendant has previously entered a guilty plea

5    pursuant to this agreement, defendant will not be able to withdraw

6    the guilty plea, and (b) the USAO will be relieved of all its

7    obligations under this agreement.

8        24.  Following the Court's finding of a knowing breach of this

9    agreement by defendant, should the USAO choose to pursue any charge

10   that was either dismissed or not filed as a result of this agreement,

11   then:

12       a.  Defendant agrees that any applicable statute of

13   limitations is tolled between the date of defendant's signing of this

14   agreement and the filing commencing any such action.

15       b.  Defendant waives and gives up all defenses based on

16   the statute of limitations, any claim of pre-indictment delay, or any

17   speedy trial claim with respect to any such action, except to the

18   extent that such defenses existed as of the date of defendant's

19   signing this agreement.

20       c.  Defendant agrees that: (i) any statements made by

21   defendant, under oath, at the guilty plea hearing (if such a hearing

22   occurred prior to the breach); (ii) the agreed to factual basis

23   statement in this agreement; and (iii) any evidence derived from such

24   statements, shall be admissible against defendant in any such action

25   against defendant, and defendant waives and gives up any claim under

26   the United States Constitution, any statute, Rule 410 of the Federal

27   Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

28   Procedure, or any other federal rule, that the statements or any

1    evidence derived from the statements should be suppressed or are

2    inadmissible.

3    COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

4    OFFICE NOT PARTIES

5        25.  Defendant understands that the Court and the United States

6    Probation and Pretrial Services Office are not parties to this

7    agreement and need not accept any of the USAO's sentencing

8    recommendations or the parties' agreements to facts or sentencing

9    factors.

10       26.  Defendant understands that both defendant and the USAO are

11   free to: (a) supplement the facts by supplying relevant information

12   to the United States Probation and Pretrial Services Office and the

13   Court, (b) correct any and all factual misstatements relating to the

14   Court's Sentencing Guidelines calculations and determination of

15   sentence, and (c) argue on appeal and collateral review that the

16   Court's Sentencing Guidelines calculations and the sentence it

17   chooses to impose are not error, although each party agrees to

18   maintain its view that the calculations in paragraph 13 are

19   consistent with the facts of this case.  While this paragraph permits

20   both the USAO and defendant to submit full and complete factual

21   information to the United States Probation and Pretrial Services

22   Office and the Court, even if that factual information may be viewed

23   as inconsistent with the facts agreed to in this agreement, this

24   paragraph does not affect defendant's and the USAO's obligations not

25   to contest the facts agreed to in this agreement.

26       27.  Defendant understands that even if the Court ignores any

27   sentencing recommendation, finds facts or reaches conclusions

28   different from those agreed to, and/or imposes any sentence up to the

1   maximum established by statute, defendant cannot, for that reason,

2   withdraw defendant's guilty plea[s], and defendant will remain bound

3   to fulfill all defendant's obligations under this agreement.

4   Defendant understands that no one -- not the prosecutor, defendant's

5   attorney, or the Court -- can make a binding prediction or promise

6   regarding the sentence defendant will receive, except that it will be

7   within the statutory maximum.

8   NO ADDITIONAL AGREEMENTS

9       28.  Defendant understands that, except as set forth herein,

10   there are no promises, understandings, or agreements between the USAO

11   and defendant or defendant's attorney, and that no additional

12   promise, understanding, or agreement may be entered into unless in a

13   writing signed by all parties or on the record in court.

14   PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

15       29.  The parties agree that this agreement will be considered

16   //

17   //

18

1   part of the record of defendant's guilty plea hearing as if the

2   entire agreement had been read into the record of the proceeding.

3   AGREED AND ACCEPTED.

4   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
5   CALIFORNIA

6   NICOLA T. HANNA
    United States Attorney

7

8   _____        ____9/16/19____
    ALEXANDER B. SCHWAB                     Date
9   Assistant United States Attorney

10  _____        ____9/10/19____
    ADAM JOINER                             Date
11  Defendant

12  _____        ____9/10/19____
                                            Date
13  ROBERT BERNSTEIN
    Attorney for Defendant
14  ADAM JOINER

15              CERTIFICATION OF DEFENDANT

16       I have read this agreement in its entirety.  I have had enough

17  time to review and consider this agreement, and I have carefully and

18  thoroughly discussed every part of it with my attorney.  I understand

19  the terms of this agreement, and I voluntarily agree to those terms.

20  I have discussed the evidence with my attorney, and my attorney has

21  advised me of my rights, of possible pretrial motions that might be

22  filed, of possible defenses that might be asserted either prior to or

23  at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

24  of relevant Sentencing Guidelines provisions, and of the consequences

25  of entering into this agreement.  No promises, inducements, or

26  representations of any kind have been made to me other than those

27  contained in this agreement.  No one has threatened or forced me in

28  any way to enter into this agreement.  I am satisfied with the

                              19

1  representation of my attorney in this matter, and I am pleading
2  guilty because I am guilty of the charges and wish to take advantage
3  of the promises set forth in this agreement, and not for any other
4  reason.

5  _____                _____
6  ADAM JOINER                                        Date
   Defendant

9             CERTIFICATION OF DEFENDANT'S ATTORNEY

10       I am ADAM JOINER's attorney.  I have carefully and thoroughly
11  discussed every part of this agreement with my client.  Further, I
12  have fully advised my client of his rights, of possible pretrial
13  motions that might be filed, of possible defenses that might be
14  asserted either prior to or at trial, of the sentencing factors set
15  forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines
16  provisions, and of the consequences of entering into this agreement.
17  To my knowledge: no promises, inducements, or representations of any
18  kind have been made to my client other than those contained in this
19  agreement; no one has threatened or forced my client in any way to
20  enter into this agreement; my client's decision to enter into this
21  agreement is informed and voluntary, and the factual basis set forth
22  in this agreement is sufficient to support my client's entry of a
23  guilty plea pursuant to this agreement.

24  _____                9/11/19
25  ROBERT BERNSTEIN                                  Date
   Attorney for Defendant
26  ADAM JOINER

27

28

                                   20

1

2

3

4

5

6                                    **EXHIBIT A**

7

8                         UNITED STATES DISTRICT COURT

9                  FOR THE CENTRAL DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,              CR No.

11              Plaintiff,                  I N F O R M A T I O N

12        v.                                [18 U.S.C. § 1343: Wire Fraud; 18
                                            U.S.C. § 1957(a): Engaging in
13   ADAM JOINER,                           Monetary Transactions in Property
                                            Derived from Specified Unlawful
14              Defendant.                   Activity; 18 U.S.C. § 1028A(a)(1):
                                            Aggravated Identity Theft; 18
15                                          U.S.C. §§ 981(a)(1)(C), 982, 1028;
                                            28 U.S.C. § 2461(c): Criminal
16                                          Forfeiture]

17

18        The United States Attorney charges:

19                                  COUNT ONE

20                            [18 U.S.C. § 1343]

21   A.   INTRODUCTORY ALLEGATIONS

22        At times relevant to the Information:

23        1.   Defendant ADAM JOINER controlled "Dark Planet Pictures,

24   LLC," a California Limited Liability Company that was registered with

25   the California Secretary of State on or about September 4, 2014, and

26   headquartered in Manhattan Beach, California, within the Central

27   District of California.

28

2.  Defendant JOINER controlled "Legends Film Co, LLC," a California Limited Liability Company that was registered with the California Secretary of State on or about December 19, 2015, and headquartered in Manhattan Beach, California, within the Central District of California.

3.  Defendant JOINER controlled a Bank of America bank account ending in 0230 in the name of "Legends Film Co, LLC" (the "Legends Bank Account").

4.  "Netflix, Inc." ("Netflix") was a media services provider headquartered in Los Gatos, California.

5.  "Storyteller Distribution Co., LLC," doing business as "Amblin Partners" ("Amblin"), was a film production company that produced and distributed films and television shows under the names DreamWorks Pictures, Amblin Entertainment, and Participant Media.

6.  "Korea Investment Global Contents Fund" ("KIGCF") was an investment fund based in South Korea.

7.  "Korea Investment Partners Co., Ltd." ("KIP") was the general partner for KIGCF and, in that capacity, managed KIGCF's assets.

8.  "Star Century Pictures Co., Ltd." ("Star Century") was a Chinese limited liability company and investment firm.

9.  "PGA Yungpark Capital Ltd" ("Yungpark") was a British Virgin Islands Company and affiliate of Star Century.

B.  THE SCHEME TO DEFRAUD

10.  Beginning on an unknown date, and continuing through at least on or about July 13, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant JOINER, knowingly and with the intent to defraud, devised, participated in,

2

1    executed, and attempted to execute a scheme to defraud victim-

2    investors, including KIGCF and Yungpark, as to material matters, and

3    to obtain money and property by means of material false and

4    fraudulent pretenses, representations, promises, and the concealment

5    of material facts.

6    C.   THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD

7          11.   The scheme to defraud operated, in substance, in the

8    following manner:

9                a.   Defendant JOINER solicited financial investments in

10   film projects from potential investors, such as KIGCF and Yungpark.

11               b.   Through oral statements and written materials,

12   defendant JOINER represented to the potential investors that

13   established film distributors, including Netflix and Amblin, had

14   agreed to distribute the film projects he was producing and for which

15   he sought financial investments.  In fact, as defendant JOINER well

16   knew, the representations were false and concealed material facts

17   because, among other things, the film distributors had not agreed to

18   distribute the films.

19               c.   Defendant JOINER created and distributed to the

20   potential investors fabricated agreements with the film distributors

21   that used the names of real persons.

22               d.   In reliance on defendant JOINER's false

23   representations, the potential investors transferred and caused the

24   transfer of funds by wire into the Legends Bank Account.

25               e.   In order to conceal his scheme and lull victim-

26   investors so that they would not investigate and contact law

27   enforcement, defendant JOINER continued making false representations

28   about directors and other talent having agreed to participate in the

3

1   film when, in fact, as defendant JOINER then knew, they had not so

2   agreed.

3   D.   <u>USE OF THE WIRES</u>

4        12.  On or about April 7, 2016, within the Central District of

5   California, and elsewhere, for the purpose of executing the above-

6   described scheme to defraud, defendant JOINER caused the transmission

7   by means of wire communication in foreign commerce an email attaching

8   a purported distribution agreement between Netflix and Dark Planet

9   Pictures, LLC, from the United States to South Korea.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWO

[18 U.S.C. §§ 1957(a), 2(b)]

13.  The United States Attorney hereby realleges and incorporates by reference paragraphs 1-8, 11, and 12 of this Information here.

14.  On or about August 12, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant JOINER, knowing that the funds involved represented the proceeds of some form of unlawful activity, knowingly engaged and willfully caused others to engage in a monetary transaction, affecting interstate commerce, in criminally-derived property of a value greater than $10,000, by transferring approximately $5,192,916 from the Legends Bank Account to California Investor Escrow, for the purchasing of a residence in Manhattan Beach, California, such property, in fact, having been derived from specified unlawful activity, namely, wire fraud, in violation of Title 18, United States Code, Section 1343.

COUNT THREE

[18 U.S.C. § 1028A(a)(1)]

15.   The United States Attorney hereby realleges and incorporates by reference paragraphs 1-8, 11, and 12 of this Information here.

16.   On or about April 7, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant JOINER knowingly possessed, transferred, and used, without lawful authority, means of identification that defendant JOINER knew belonged to another person, that is, the name and signature of victim T.S., during and in relation to the offense of wire fraud, a felony violation of Title 18, United States Code, Section 1343, as charged in count one of this Information.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

17.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of defendant ADAM JOINER's conviction of the offense set forth in count one of this Information.

18.   Defendant JOINER, if so convicted, shall forfeit to the United States of America the following:

(a)   all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

19.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

7

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

20. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), in the event of defendant ADAM JOINER's conviction of the offense set forth in count two of this Information.

21. Defendant JOINER, if so convicted, shall forfeit to the United States of America the following:

(a)  Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

22. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the

1  course of the money laundering offense unless the defendant, in
2  committing the offense or offenses giving rise to the forfeiture,
3  conducted three or more separate transactions involving a total of
4  $100,000.00 or more in any twelve-month period.

FORFEITURE ALLEGATION THREE

[18 U.S.C. §§ 982 and 1028 and 28 U.S.C. § 2461(c)]

23.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 982 and 1028 and Title 28, United States Code, Section 2461(c) in the event of defendant ADAM JOINER's conviction of the offense set forth in count three of this Information.

24.  Defendant JOINER, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense;

(b)  Any personal property used or intended to be used to commit the offense; and

(c)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b) and 1028(g), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the

10

1   court; (d) has been substantially diminished in value; or (e) has

2   been commingled with other property that cannot be divided without

3   difficulty.

4

5                                      NICOLA T. HANNA
                                       United States Attorney
6

7

8                                      BRANDON D. FOX
                                       Assistant United States Attorney
9                                      Chief, Criminal Division

10                                     RANEE A. KATZENSTEIN
                                       Assistant United States Attorney
11                                     Chief, Major Frauds Section

12                                     POONAM G. KUMAR
                                       Assistant United States Attorney
13                                     Deputy Chief, Major Frauds Section

14                                     ALEXANDER B. SCHWAB
                                       Assistant United States Attorney
15                                     Major Frauds Section

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    11